

FILED

SEP 0 8 2009

CLERK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| BRETT A. SKOVLUND, | * | CIV. 08-4078 |
| | * | |
| Plaintiff, | * | |
| | * | |
| -vs- | * | REPORT and RECOMMENDATION |
| | * | |
| MICHAEL J. ASTRUE, | * | |
| Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff seeks judicial review of the Commissioner's final decision denying him a period of disability commencing May 1, 2005 (AR 65-70) and payment of disability insurance and medical benefits ("SSI") under Title XVI of the Social Security Act.[1] The case was referred to the Magistrate Judge for a Report and Recommendation. For the reasons more fully explained below, it is respectfully recommended that the Commissioner's decision should be **REVERSED,** and remanded to the Social Security Administration for an appropriate calculation of benefits due.

---

[1]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon his "coverage" status (calculated according to his earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.

In this case, the Plaintiff filed his application for SSI benefits only, because he has never engaged in substantial gainful employment and has no significant earnings history. AR 75. His application was filed on September 7, 2005. AR 71.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g). Judge Piersol referred this matter to the Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and a Standing Order dated November 29, 2006.

## ADMINISTRATIVE PROCEEDINGS

Plaintiff filed the instant claim for benefits on September 7, 2005. AR 65-71. In a form entitled "Disability Report–Adult" (undated) (AR 80-88) Plaintiff described the illnesses, injuries or conditions that limit his ability to work as follows: "Burns and ADD need 32 surgeries for knee and back, lungs burned and have trouble breathing." AR 81. He explained that these problems limit his abilities in the following ways: "I don't pay attention to what I am doing and I get in trouble and they get mad at me. I don't understand sometimes what I am supposed to do. My hands are stiff and I drop things. The doctors want to do a nerve test on me. My back and knees have pain in them and my hands hurt sometimes." AR 81. Plaintiff further explained that he has only worked part time because "they" think it is too much for him to handle. He can't do masonry work because of his back and knee. "They" always have to explain things to him over and over and it takes time away from the job. AR 81. He stopped working because his knee hurt too much and he could not walk on it. *Id.*

Plaintiff's claim was denied initially on January 11, 2006 (AR 27-29) and on reconsideration on April 26, 2006. AR 32-34. He requested a hearing (AR 42) and a hearing was held on June 12, 2007, before an Administrative Law Judge (ALJ), the Honorable James D. Geyer. AR 214-89. On September 22, 2007, the ALJ issued a twelve page, single-spaced decision affirming the previous denials. AR 13-24. On October 29, 2007, Plaintiff requested the Appeals Council to review the ALJ's decision (AR 9), but the Appeals Council denied review on May 8, 2008. AR 5-7. Plaintiff then timely filed his Complaint in the District Court on June 11, 2008.

## FACTUAL BACKGROUND

### A.    Biographical Information

Plaintiff was born in 1981. He was twenty-three years old on the date of the alleged onset of his disability, and twenty-five on the date of his administrative hearing. AR 218. He is single, has a minor child for whom he is responsible to pay support but does not have any contact, and with the exception of a short period of time, has always lived with and been dependent upon his divorced mother. AR 218-19; 248. He did not complete high school. He received special education classes in high school. AR 123. His cumulative GPA was 1.6 when he dropped out. He attempted to obtain his GED but he was unable to pass the tests. AR 219-20.

### B.    Work Experience

Plaintiff has worked as a pallet builder, a brick tender, a carpet cutter, a janitor, and a factory worker. None of his work experience qualified as past relevant work because his earnings were never enough to constitute substantial, gainful employment. AR 22, 222-228. Plaintiff attempted to obtain employment through Job Corps, but did not complete the program. *Id.*

Plaintiff worked with Career Advantage for several years. The assignments involved simple tasks but Plaintiff was unable to maintain employment. Plaintiff's job coach opined Plaintiff is "unemployable" because of his anger management and medication compliancy difficulties. AR 129.

### C.    Medical Evidence

#### 1.    East Central Mental Health Center, Brookings, South Dakota (July, 2002, Through September, 2005)

Plaintiff first reported to the East Central Mental Health Center on July 11, 2002. Plaintiff treated with Dr. Luther Heglund. Plaintiff was at the time living at home with his mother. AR 150. Plaintiff had a history of ADHD, cannabis abuse, alcohol abuse, learning disabilities, and mixed personality traits with anti-social traits. Plaintiff reported to the Center indicating he needed help with his attention span and wished to "go on some medicine." *Id.* Plaintiff's chemical dependency therapist recommended the evaluation. *Id.* Dr. Heglund found the records from Plaintiff's inpatient hospitalization at the Human Services Center in Yankton which occurred approximately one year

3

earlier. The treating physician from that hospitalization (Dr. Somapali) recommended Plaintiff discontinue his medications because of his chemical dependency history. AR 150. Plaintiff reported that while he was on Ritalin, he was able to hold down a steady job at Larson Windows. *Id.*

Plaintiff denied problems with his mood or that he had ever had problems with his mood. Dr. Heglund noted previous records, however, which indicated Plaintiff had attempted suicide approximately one year earlier which resulted in his hospitalization in Yankton. AR 150. Plaintiff admitted he did not have many friends and spent much time isolated. He had not worked in over a year although he had applied "every place." *Id.*

Dr. Heglund noted Plaintiff was oriented to person, time and place. AR 151. His thought production was normal. Memory was intact. Abstraction was only fair and intelligence was below average. *Id.* Attention and concentration was adequate, but insight and judgment was "strongly questioned." Plaintiff's Global Assessment of Functioning (GAF)[2] was 55. Dr. Heglund started Plaintiff on Wellbutrin.[3]

Plaintiff returned to Dr. Heglund on July 25, 2002. Plaintiff reported to Dr. Heglund that things were "fine." He thought he was a little more anxious after starting the medication. Dr. Heglund noted Plaintiff was "slightly antsy." Dr. Heglund increased Plaintiff's dose of Wellbutrin and instructed him to return in one month. AR 149.

---

[2]GAF stands for Global Assessment of Functioning. A GAF score of 55 indicates **"moderate symptoms** (e.g. flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational or school functioning** (e.g. few friends, conflicts with peers or co-workers). A more specialized version of the GAF, developed by a division of the Department of Veteran's Affairs (MIRECC) specifically identifies the effect of the scores upon a patient's ability to work. On the MIRECC scale, a score of 55 indicates "misses work fairly frequently; inconsistently able to attend to child care; misses school frequently." *See* http://www.desertpacific.mirecc.va.gov/gaf/index.shtml

[3]Wellbutrin is an antidepressant indicated for the treatment of major depressive disorder. Www.rxlist.com.

Plaintiff did not return to the East Central Mental Health Center, however, until nearly two years later on April 12, 2004 AR 146. At that time, Plaintiff saw Dr. Peter Warhol. Plaintiff was accompanied by his mother. She complained that Plaintiff lacked motivation, slept all the time, and could not find employment. *Id.* Plaintiff denied that he was depressed, but admitted his energy and concentration levels were poor and that he slept a lot. He enjoyed fishing and hanging out with his friends. His listening and organizational skills were lacking. He admitted losing things frequently and that he was easily distracted. He and his mother both reported that he was somewhat impulsive.

Plaintiff reported attending anger management classes at age ten. His primary physician (Dr. Turner) prescribed Ritalin[4] to Plaintiff between ages fourteen and eighteen. AR 146. Plaintiff also reported his prior prescription for Wellbutrin but reported he did not like the side effects (headaches). He also reported having previously used Serzone[5] but discontinuing that drug because of the side effects, but Plaintiff did not specify the side effects. AR 146. Dr. Warhol noted Plaintiff's past treatment for second and third degree burns to his arms and face when Plaintiff was seventeen years old. AR 146. Plaintiff denied any current drug use but admitted to smoking a pack of cigarettes a day and twelve pack of beer per week. Dr. Warhol noted Plaintiff was then taking Strattera.[6] He expressed concern, however, about how he was going to pay for it. AR 145. Dr. Warhol gave Plaintiff samples and the forms to complete in order the receive assistance with paying for future mediation. AR 145.

Plaintiff saw a physician's assistant at the Clinic on August 25, 2004. AR 143. At that time Plaintiff was taking no medication. He wished to be put back on Ritalin because it calmed him

---

[4]Ritalin is a mild central nervous system stimulant. It is indicated for attention deficit disorder in children. Www.rxlist.com

[5]Serzone is an anti-depressant. It is indicated for the treatment of depression. Www.rxlist.com.

[6]Strattera is a noreprinephrine reuptake inhibitor. It is indicated for the treatment of ADHD. Www.rxlist.com

down and gave him energy. Plaintiff reported he tried the Strattera but did not like it because of the side effects. The physician's assistant noted that Dr. Turner, Dr. Heglund and Dr. Warhol all agreed Ritalin was inappropriate for Plaintiff because of his history of substance abuse. AR 143. Plaintiff did not want to return to the Wellbutrin. He reported it made him "fidgety."

Plaintiff reported he'd never worked full-time. AR 143. The longest he'd ever held a job was four months. The physician's assistant described Plaintiff has a poor historian and "somewhat unreliable."[7] She could not determine whether his poor reliability in reporting was because of his borderline intellectual functioning or just unreliable memory. AR 143. The physician's assistant suggested a trial of Buspar,[8] but Plaintiff refused it because he said he had tried it before and it had no effect on him. The physician's assistant agreed Plaintiff should not be given any further access to Ritalin. AR 144. She recommended Plaintiff return to Dr. Alvine for alternative medication. AR 144.

Plaintiff saw Dr. Allison Alvine on October 14, 2004. Plaintiff was taking no medications. AR 141. Plaintiff's case worker from the Career Learning Center accompanied him to the appointment. Plaintiff reported problems with anxiety and concentration. The case worker reported her observation that Plaintiff always appeared "fidgety." Plaintiff reported having trouble paying attention and completing tasks. Plaintiff reported that Ritalin helped him when he was a child in school. He did not report feeling depressed, but instead indicated he felt "nervous." Dr. Alvine observed Plaintiff was alert, pleasant and cooperative. His eye contact was intermittent, and he was in constant movement in his chair—swinging his feet or twisting back and forth. AR 141. His mood was anxious and his affect was constricted. Attention and concentration were fair to poor. His speech was normal and no psychotic tendencies were noted. Insight and judgment were fair. She

---

[7]For example, Plaintiff denied to the physician's assistant that he had any history of self-harm behavior. The physician's assistant, however, had reviewed the file from Plaintiff's suicide attempt and hospitalization at the Human Services Center, so she knew Plaintiff was not entirely accurate on that point.

[8]Buspar is an antianxiety agent. It is indicated for the management of anxiety disorders or the short-term relief of the symptoms of anxiety. Www.rxlist.com

diagnosed generalized anxiety disorder, history of ADHD, combined type, history of substance abuse and nicotine dependence, personality disorder, NOS with dependence traits, and obesity. AR 141. She did not want to prescribe Ritalin because of Plaintiff's history of substance abuse. Dr. Alvine prescribed Cymbalta[9] and recommended follow up in two months.

Plaintiff returned to Dr. Alvine in two months as instructed. AR 140. He reported he'd stopped taking Cymbalta two weeks earlier because of the side effects (urinary hesitancy). At that time he was living in his own apartment and working full time. *Id.* He reported pacing a lot and having trouble paying attention and focusing. He reported feeling anxious most of the time. His boss reported to his case worker that Plaintiff had a very difficult time staying focused and on task. AR 140. Plaintiff reported he was avoiding alcohol and drugs. *Id.* Plaintiff again expressed his desire to try a stimulant type drug to keep his symptoms under control. Dr. Alvine noted his speech was normal, his mood was anxious, and his affect was constricted. His attention and concentration was fair, and his judgment and judgment were fair. *Id.* She decided to start him on a trial of Adderall.[10] Dr. Alvine obtained one month of free samples for Plaintiff and asked Plaintiff to return to the clinic to apply for patient assistance to help pay for the medication. AR 140.

Plaintiff saw Dr. Alvine again in January, 2005. At that time, Plaintiff reported he had not taken his Adderall for three weeks because his prescription fell down the drain. AR 138. Plaintiff reported he had a good response to the medication for the short time that he took it before the remaining pills fell down the drain, and that his boss thought he did will on the medication. *Id.* Plaintiff's case worker from the Career Learning Center was present for the appointment and concurred with Plaintiff's assessment. Dr. Alvine noted Plaintiff could not afford non-generic medication. AR 139. She indicated he would check on the status of obtaining Adderall through the indigent program. *Id.* Plaintiff missed his next appointment with Dr. Alvine. AR 137.

---

[9]Cymbalta is a selective serotonin and norepinephrine reuptake inhibitor. It is indicated for the acute and maintenance treatment of major depressive disorder. Www.rxlist.com.

[10]Adderall is an amphetamine. It is indicated for the treatment of attention deficit hyperactivity disorder and narcolepsy. Www.rxlist.com.

In September, 2005, Plaintiff again missed his appointment with Dr. Alvine, but his mother came to the appointment without him. AR 136. She explained that she feared Plaintiff was "out of control." Dr. Alvine recommended involuntary commitment and/or a chemical dependency assessment. *Id.*

### 2. Avera Brookings Medical Clinic (August 2003 through February 2006)

The record contains notes from the Avera Brookings Medical Clinic beginning in August, 2003. Many of the notes are handwritten and consist of appointment cancellations and telephonic requests for antibiotics. AR 167-68. Beginning in 2004, however, Plaintiff visited Dr. Turner at the clinic complaining of knee pain and joint pain. AR 165-66. Plaintiff also complained of a pilonidal cyst on his tailbone. AR 165. In September, 2005, Dr. Turner prescribed Cymbalta. AR 164. Dr. Turner prescribed an antibiotic for any infection which may be present in the pilonidal cyst, but instructed Plaintiff that surgery would be necessary to remove it. *Id.*

In February, 2006, Plaintiff reported two episodes of seizure-like activity to Dr. Turner. AR 164. He also reported problems with depression and indicated he'd like to start medication for those symptoms. *Id.* Dr. Turner ordered a sleep-deprived EEG which was normal. AR 170. A CT scan of the head was also normal. AR 171.

### 3. Brookings Hospital Emergency Room (Various Dates, May, 2005 through October, 2005)

Plaintiff was treated four times in the space of six months in the Brookings Hospital Emergency room between May and October, 2005. On May 15, 2005, Plaintiff presented in the emergency room complaining of pain below his right ear, and insisting he had brain tumors. AR 159. He admitted he had been drinking *Id.* He was belligerent and insisted his "brain tumors" be removed. *Id.* The physician on duty noted a sebaceous cyst, and informed Plaintiff blood would be drawn to test for infectious process. Plaintiff became belligerent and left. *Id.*

Plaintiff returned to the emergency room on June 5, 2005 complaining of right knee pain

since a fall the previous Thursday. AR 158. An x-ray of the knee showed no abnormality. The attending physician diagnosed internal derangement of the knee and placed Plaintiff in an immobilizer and crutches. AR 157.

Plaintiff returned to the emergency room again on August 9, 2005 after an altercation with his mother. AR 156. He caught his hand in the car door when his mother rolled the window up. Plaintiff was arrested as a result of the altercation. *Id.* Plaintiff smelled of alcohol upon his admission to the hospital. *Id.* Plaintiff's left hand was swollen, bruised and painful to the touch. AR 155. X-rays revealed no fracture. AR 161.

Plaintiff was again seen in the emergency room on October 28, 2005. AR 154. He complained of right earlobe pain in the location of a past ear piercing. The treating physician diagnosed an abscess. AR 154. The abscess was drained and cleansed, and Plaintiff received antibiotics for infection control. *Id.*

### 4. Michael Moeller, MD Medication Management (June 2006 through March 2007)

It appears Dr. Moeller is associated with East Central Mental Health Center but his records appear separately in the record. Plaintiff sought treatment from Dr. Moeller on June 20, 2006. Dr. Moeller noted Plaintiff had been "lost to follow up the last 18 months." AR 207.[11] Plaintiff appeared wanting to get back on medicines. *Id.* "He has had a couple of odd jobs and feedback they have gotten from the employers is that he is very inattentive and tends to drift off." *Id.* Dr. Moeller noted Plaintiff was very friendly and cooperative but "very antsy, constantly moving, he makes fleeting eye contact. He is not irritated. Again, there is a lot of hyperactivity." *Id.* Dr. Moeller

---

[11]While it is true that Plaintiff had not been seen at the East Central Mental Health Center for nearly eighteen months, Plaintiff had treated with Dr. Turner at the Avera Brookings Medical Clinic in the interim. AR 164. Dr. Turner had prescribed Cymbalta in September, 2005 AR 166. In February, 2006, Plaintiff discussed further whether he should be taking other or further mediation for depression. AR 164.

diagnosed Adult ADHD and a history of poly substance abuse. Dr. Moeller prescribed Concerta[12] and instructed Plaintiff to return in one month. Plaintiff returned the following month. AR 205. His mother accompanied him to the appointment and reported he was doing better since starting on Concerta. *Id.* Plaintiff agreed. Dr. Moeller observed Plaintiff was not quite as fidgety. Dr. Moeller instructed Plaintiff to return in three months. Plaintiff returned to the clinic on September 29, 2006. He was distressed to learn he would not be able to obtain free medication. AR 205. Plaintiff reported the medication continued to help with his symptoms. *Id.* When Plaintiff returned in November, 2006 he continued to do well on Concerta. His diagnosis remained the same and Dr. Moeller continued his prescription. AR 204. Plaintiff returned to Dr. Moeller again in March 2007. Dr. Moeller again noted Plaintiff was doing "fairly well" on Concerta and again renewed Plaintiff's prescription. AR 203.

### 5. Brooking Psychological Group (Thomas Shaffer, Ph. D and Bradley Woldt, Ph. D.) Neuropsychological Evaluation (7-26-05 and 8-03-05)

Plaintiff was referred to Dr. Shaffer and Dr. Woldt by the State of South Dakota, Division of Rehabilitation Services for neuropsychological testing to assist in diagnosis, treatment and rehabilitation planning. AR 130. The physicians reviewed past medical, psychiatric, vocational and educational records and met with plaintiff on July 26, 2005 and August 3, 2005. AR 130-133. Drs. Shaffer and Woldt noted Plaintiff's history was remarkable for attention deficit hyperactivity disorder, oppositional defiant disorder, social phobia, anxiety disorder NOS, dysthymic disorder, poly substance abuse, learning disability, personality disorder NOS, borderline intellectual functioning, and NOS. They determined their report was a reliable measure of his current psychological functioning even though Plaintiff was an extremely poor historian. They drew many of their conclusions from their review of Plaintiff's records. AR 130.

Drs. Shaffer and Woldt noted Plaintiff received special education in school beginning in fifth grade until he dropped out. Plaintiff's individual education plans (IEPs) from his high school years

---

[12]Concerta is a central nervous system stimulant. It is indicated for the treatment of attention deficit disorder in children ages 6 and older, adolescents, and adults. Www.rxlist.com

suggested significant behavior disturbances and learning disabilities. AR 130. He was hospitalized at age sixteen when he sustained extensive burns while abusing an inhalant. Drs. Shaffer and Woldt characterized Plaintiff's psychiatric history as "extensive." It included anger management classes, treatment for ADHD beginning at age fourteen, chemical dependency counseling on multiple occasions, and at least one inpatient hospitalization after a suicide attempt. AR 130. Plaintiff has been treated at East Central Mental Health and Dependency Center since 2001. At the time of the evaluation performed by Dr. Shaffer and Dr. Woldt, Plaintiff was not taking any medication.

Plaintiff presented with adequate personal hygiene. His eye contact was intermittent. His attitude was guarded. He was a poor historian. AR 131. His speech was clear, but he had problems expressing himself clearly. He could follow simple directions, but could not interpret a paragraph from a magazine article. Plaintiff reported significant anxiety but no suicidal ideation. The doctors noted fine motor control disturbance. AR 131.

Plaintiff was able to complete simple tasks such as reciting the alphabet, list the days of the week both forwards and backwards, and count to twenty forwards and backwards. He was, however, extremely slow to complete these tasks. He was unable to list the last four presidents and could not correctly interpret two simple proverbs. On a brief screen for malingering in memory, Plaintiff was able to recall 16 of 16 items. His ability to make simple social judgments was impaired. AR 131.

Drs. Shaffer and Woldt performed general intellectual functioning testing using the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III). His verbal IQ skills were in the low average range (10th percentile), his performance IQ was in the borderline range (4th percentile), his processing speed fell within the borderline range (5th percentile), his working memory fell within the 9th percentile. His full scale IQ was 75. His general cognitive ability was in the borderline range of intellectual functioning. His overall reasoning and thinking abilities exceed those of approximately 5% of adults his age. AR 132.

By history, Plaintiff met the criteria for attention deficit hyperactivity disorder, combined

11

type, anxiety disorder, NOS, history of polysubstance abuse, nicotine dependence, and personality disorder, NOS with dependent traits. He displayed symptoms of alcohol abuse, nicotine dependence, borderline intellectual functioning, and personality disorder NOS with dependant and antisocial traits.

Plaintiff failed to return for further neuropsychological evaluation after two visits with Drs. Shaffer and Woldt. Plaintiff informed his employment coach that the evaluation and testing made him feel "stupid." AR 133. He went out and got drunk. *Id.* The testing which was completed, however, suggested that Plaintiff functioned in the borderline intellectual range. The doctors also believed he had underlying neuropsychological impairments independent of his intellectual functioning. AR 133. Their review of the records and Plaintiff's initial presentation also led the doctors to diagnose DSM-IV Axis II personality disorder diagnosis. The physicians were unable to confirm the diagnosis, however, in the absence of further testing. *Id.* They further opined Plaintiff was unable to live independently or maintain employment, and recommended inpatient treatment for substance abuse. *Id.*

6.     **Non-Treating, Non-Examining State Agency Physician (Dr. Buchkoski, PhD, Psychologist, 1-10-2006)**

On January 10, 2006, psychologist Dr. Jerry Buchkoski reviewed Plaintiff's medical records and completed a psychiatric review technique form (AR 178-191) and a mental residual functional capacity assessment (AR 174-177). Dr. Buchkoski did not examine or interview the Plaintiff.

Dr. Buchkoski found an RFC was necessary for Plaintiff's physical medical dispositions. AR 178.[13] The following categories of psychiatric conditions affected Plaintiff's evaluation: 12.02 (organic mental disorders); and 12.09 (substance addiction disorders). Regarding Plaintiff's organic mental disorder, Dr. Buchkoski found Plaintiff had borderline intellectual functioning. AR 179.     Regarding Plaintiff's substance addiction disorders, Buchkoski found Plaintiff had behavioral changes or physical changes associated with the regular use of substances that affect the

---

[13]A physical RFC does not appear in the record.

12

central nervous system. AR 186. Under the "B" criteria, Dr. Buchkoski found Plaintiff had moderate difficulties in maintaining concentration, persistence or pace and no episodes of decompensation, each of extended duration. AR 188. Dr. Buchkoski found only "mild" restriction of activities of daily living and difficulties in maintaining social functioning.

In support of his findings, Dr. Buchkoski noted Plaintiff's comment that when he did not pay attention to what he was doing he got into trouble. AR 190. Dr. Buchkoski also noted that Plaintiff was a poor historian, but on January 13, 2005 when he was on Adderall he had been doing well at his job and seemed to listen and pay attention better. *Id.*

Dr. Buchkoski's mental residual functional capacity assessment estimated that Plaintiff's ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods of time, and respond appropriately to changes in the work setting were moderately limited. AR 174-75. Otherwise, he perceived that no significant limitations were presented by any of Plaintiff's mental conditions. *Id.* In the section provided for Dr. Buchkoski to explain his findings, he noted Plaintiff has a history of substance usage "which has impacted his care for alleged ADHD." AR 176. Buchkoski opined Plaintiff had abused substances "possibly including those prescribed for him." *Id.* Buchkoski noted Plaintiff's problems with alcohol "which has impacted his ability to show up for appointments." "It is likely this is partially a cause for past problems in coming to work." Buchkoski opined Plaintiff had the intellectual ability to perform simple job tasks and that he had lived independently, and that if he were to be compliant and remain abstinent he would function much more effectively. AR 176. Dr. Buchkoski likewise opined that Plaintiff's mental residual functional capacity was consistent with work. *Id.*

### 7. Non-Treating, Non-Examining State Agency Physician (Dr. Gunn, PhD, Psychologist, 4-25-06)

On April 25, 2006, psychologist Dr. Richard Gunn reviewed "all the evidence in the file." Gunn did not complete additional forms, but simply wrote on a form entitled "Case Analysis" that "the assessment of 1-10-06 is affirmed as written." Dr. Gunn did not examine or interview the

13

Plaintiff.

### D.    Hearing Testimony

#### 1.    Plaintiff's Testimony

Plaintiff testified at the hearing which was held on June 12, 2007. AR 218. Plaintiff was born in 1981 and was twenty-five years old on the date of the hearing. He is single, never been married, and lives with his mother. *Id.* At the time of the hearing, he had a daughter who was five and one half years old with whom he did not have contact but who he was obligated to support. AR 248. He lived on his own for a year. He attended school through the eleventh grade. AR 219. He attempted to get his GED, but could not pass the tests. *Id.* He can read, but needs help filling out a job application because his hands give him trouble and he has a hard time writing, and he needs help with some of the questions such as remembering past jobs and references. AR 220. Plaintiff explained that his hand goes numb and it is hard for him to pick things up. AR 285. He admitted, however, that he still uses his right hand to eat and to dress himself. AR 287-88.

Plaintiff was involved in an accident approximately ten years before the administrative hearing. AR 249. He was in a vehicle. Someone in the vehicle (Plaintiff asserts it was the other occupant) was "huffing" and Plaintiff tried to light a cigarette, which caused a fire in the car. AR 249. Plaintiff has not abused inhalants since that time. *Id.*

Plaintiff has never had his own checking account. He can "sometimes" count change if it is an even number. AR 221. He does not believe he is physically or mentally able to work because he "can't handle it." AR 221-22. The last job he had before the hearing was at "Advance." It was a place for people with disabilities. He handled parts and built pallets. AR 222. He used an air gun. AR 223. He didn't like it because it hurt his back. *Id.* He got mad and quit because he was hurting. *Id.* He was frustrated because he was not making his "numbers" and he was going as fast as he could. AR 223. He "just couldn't take it anymore" so he just quit. AR 223-24. Before his job with Advance, Plaintiff worked for Dave Olson Masonry. AR 224. That job ended because Mr. Olson just did not think Plaintiff could handle it. AR 225. He also worked as an assistant at a flooring

14

store. AR 225. Plaintiff did not know why that job ended. *Id.* He surmised he quit because he did not like lifting carpet. AR 226. He was in Job Corps for a short time (he rode the bus to Rapid City to get there) but he thinks he quit that because he is not good at keeping schedules. AR 226. He was the janitor at the Elks Club for a short time, but they went out of business. AR 227. He does not think he could be a janitor now, because he's "just not used to all that stuff." *Id.* He worked at Comfort Built in 2000. Plaintiff testified that job ended because they went out of business, but he also testified he tried to get back on there but could not because he was cited for "insubordination." AR 228. He didn't think he could do the work in any event because "I just can't stand it. I don't know why. People drive me nuts, I guess." AR 228. He also worked for a tool company once for a week but lost that job because he was not fast enough. *Id.*

At the time of the hearing, Plaintiff received no income whatsoever and was supported solely by his mother. AR 229. He had been to job service "lots of times" in search of job assistance, but not since his last unsuccessful job attempt, because he "figured it's pointless." AR 229. Plaintiff does not have a plan for the future. *Id.* At the time of the hearing, Plaintiff was taking Concerta, prescribed by Dr. Moeller AR 230. He does not suffer any side effects from the medication. The purpose of Concerta is to help him stay focused. *Id.* He believes it helps in that regard. Plaintiff takes his medicine "most of the time." AR 231.

Plaintiff watches TV eight or nine hours a day. AR 231. He does not have many friends. He hangs out with friends once a month. AR 232. When he hangs out with friends, he goes to their house and plays play station. He does not invite friends to his house. He does not go to the mall. He does not shower every day. AR 232. He does not do any housework, but he does microwave some food for himself. AR 233. He does no yardwork. AR 233-34. He does not use a computer. AR 234. He plays video games once or twice a month by himself. *Id.* Plaintiff has a dog, but his mom usually takes care of it. AR 235. He does let the dog outside. *Id.* He helps his mother carry the groceries in. AR236. He does not drive. AR 236. He hasn't ridden a bike in years–he does not really go anywhere. AR 237. He sees his father in Brookings every five or six months. AR 238. The previous day, he'd arisen at three in the morning, eaten a microwave pizza at 9:00 a.m., and

then watched TV in his room the rest of the day. AR 240-41.[14] He saw his mother at approximately 10:00 p.m. when he went to the kitchen, but he did not speak to her. AR 242.

Plaintiff estimated he could sit "not very long" before he had to get up. AR 244. He thinks he could stand for a half an hour before he needs to sit down. *Id.* He estimated he could walk for a couple of blocks before he needs to stop and rest. *Id.* He estimated he could lift and carry fifteen pounds. AR 245. He last drank alcohol at a friend's house a month earlier when he drank four or five beers. *Id.* He estimated he was last "drunk" two months before the hearing. AR 247. He has never gone to in-patient alcohol treatment. AR 251.

Plaintiff does not fish much anymore because he does not have a license. AR 251. He last played sports when he was in high school. *Id.* Plaintiff explained that sometimes he does not take his medications because he cannot afford them. AR 254. They cost $130.00. At the time of the hearing, he was on the Johnson & Johnson program. He had not re-applied for the program yet because he "hadn't really thought about it." *Id.* The ALJ asked Plaintiff about the job coach's statement regarding Plaintiff's anger issues, and Plaintiff said "I don't know how to explain it." AR 254.

Plaintiff asserted that in addition to his back problems, he had a "blown knee" on the left side. AR 255. He claimed he needed surgery but could not afford it. *Id.* He claims he hurt the knee while working for Mr. Olson doing masonry work, but he did not make any type of work comp claim. *Id.* He asked his family doctor to look at it, but has not had an orthopedic specialist look at it because he does not have insurance. AR 256.

Plaintiff also claims he has a hard time following instructions on the job. AR 256. He cannot follow written or verbal instructions. *Id.* He has a hard time comprehending verbal instructions. AR 257. He has a hard time getting along with other people on the job. "They get me

---

[14]It is noted that Plaintiff answered many of the ALJ's questions with "I don't know" or "I'm not sure." *See e.g.* AR 243.

off task. I don't like them around me." AR 257. When he tried to explain why it bothered him to have people around he said "I don't know. I don't really talk to a lot of people, I guess." AR 258.

### 2. Pam Skovlund

Pam Skovlund is Plaintiff's mother. Plaintiff has always lived with her with the exception of about one year when he was in an apartment on his own. AR 260. Living on his own did not work out well at all for Plaintiff. Ms. Skovlund got calls every day to come help him. *Id.* He could not manage money or keep his place clean, and he did not have a car to get himself around. *Id.* Ms. Skovlund is familiar with vocational rehabilitation's efforts to help Plaintiff find work. AR 261. Although they tried to help her son, he was never able to hold a job. He either quit or was fired within three months. *Id.* For example, he worked a week and was then fired without being paid because the employer said Plaintiff's attention span was too short. *Id.* He was fired from all the other jobs she could recall. *Id.* She said he "couldn't function" in Rapid City in the Job Corps program. AR 262. In her own words, Ms. Skovlund opined Plaintiff cannot work because of his short attention span and his anger issues. AR 262. She said "if they push him to go too fast, he gets all flustered and upset and then he's ready to leave.. And he just, he doesn't function like a normal person does in a normal job situation from what I can see." *Id.* She explained that if he gets instructions, he forgets them. *Id.* She believes that alcohol has become less of an issue for Plaintiff. AR 263. Ms. Skovlund did most everything around the house. AR 264. She thinks Plaintiff is "a little bit" better when he stays on his medication. *Id.* She observed that Plaintiff is calmer when he is on his medication, although he still bangs his head against the back of the chair constantly. AR 264. She explained Plaintiff has done that since he was a small child. *Id.* She believes his situation is getting worse. AR 266. She does not think he can hold a full-time job. AR 268. His attention span is too short and he is too slow. AR 269.

### 3. Dr. Michael McGrath, Psychologist

Dr. McGrath listened to the hearing testimony and reviewed the record. AR 272. He opined that Plaintiff exhibits the following psychological impairments: 12.02 organic mental disorders; 12.08 personality disorders, and 12.09 substance addiction disorders. He testified that Plaintiff's

17

full-scale IQ is 75, but his adaptive behavior is less than low borderline intellectual functioning. AR 273. Attention deficit disorder was repeatedly noted. Regarding the 12.08 personality disorder, references were made to anti-social features and his hearing testimony was consistent with that. Some features of his testimony were also consistent with a dependent personality disorder. *Id.* The records also suggest a lot of oppositional conduct disorder which preceded the development of the anti-social disorders. AR 274. Dr. McGrath believes Plaintiff is fairly young to have a diagnosis of personality disorders, but he certainly does demonstrate those features. AR 274.

Dr. McGrath opined that the substance addiction disorder is "not a big factor at this point." AR 274. Dr. McGrath accepted Plaintiff's explanation that he used the drunkenness excuse to avoid further testing with Drs. Woldt and Shaffer because the testing made Plaintiff feel inadequate and he wanted to avoid it. AR 274.

Dr. McGrath opined that there are only mild restrictions on Plaintiff's daily living activities. AR 274. Plaintiff has moderate difficulties with social activities and with concentration, persistence and pace. He has had one episode of decompensation. AR 275. Dr. McGrath testified that the "C" criteria do not apply. Plaintiff is limited to understanding and remembering one and two step routine instructions. *Id.* He should be able to follow through with such instructions assuming he stays on his medication. He can tolerate only brief and superficial contact with the public, co-workers and supervisors.

### 3. Vocational Expert's Testimony

Tom Audet testified at the administrative hearing as a vocational expert. AR 277. The ALJ asked Mr. Audet to assume an individual with Plaintiff's age, education and work experience. AR 278. Next, the ALJ asked the VE three hypothetical questions. First, he asked Mr. Audet to assume Plaintiff and his mother's hearing testimony was fully credible. *Id.* The VE opined that Plaintiff has been assigned a job coach and even with the job coach Plaintiff had been unable to maintain a job. "Based on that testimony he doesn't appear that he's capable of maintaining a job. And I think if that continues, it's going to be more and more difficult to place this young man." AR

278.

Next, the ALJ asked Mr. Audet to adopt the limitations expressed by the Dr. McGrath. Specifically, the ALJ asked Mr. Audet to assume Plaintiff was capable of remembering one and two step routine instructions and can follow through with such instructions assuming he stays on his medication. Mr. Audet also assumed Plaintiff was capable of working in environments with brief and superficial contact with the public, co-workers and supervisors. Mr. Audet assumed there are no physical restrictions, only mental restrictions. AR 279. Audet opined available jobs existed such as: conveyer feeder off, plugging things into a machine and having it come out the other side. This is a medium duty, unskilled job (DOT code 921).[15] Audet also opined Plaintiff could be a bakery worker on a conveyor line which is a light duty/unskilled job, or a housekeeping/cleaner, which is a light duty/unskilled job, or a laundry laborer, which is a medium duty/unskilled job.

For his third hypothetical, the VE was asked to assume some physical restrictions in additional to the mental restrictions in the second hypothetical. The ALJ asked the VE to assume a restriction to light duty because of the residual effects of the burns Plaintiff sustained approximately ten years earlier. AR 280. The ALJ further instructed that Plaintiff should avoid even moderate exposure to smoke, fumes, dust, etc. The VE opined Plaintiff remains eligible for the bakery worker job and the housekeeping job. AR 280. The VE also opined Plaintiff remains capable of an assembler job, which is unskilled/sedentary. *Id.*

### E.    Third Party Statements

The record contains a written statements from the Plaintiff's school case manager from the Brookings School District (Leslie Yeager), from Plaintiff's former employer (David Olson), from Plaintiff's former Employment Consultant at Career Advantage in Brookings, South Dakota (Loni Ching) and from Plaintiff's mother ( Pam Skovlund). Such statements should ordinarily be considered to determine the credibility of a claimant's symptoms. *See* 20 C.F.R. §§ 404.1513(d)(4); 404.1529; 416.913(d)(4); 416.929; *Willcockson v. Astrue*, 540 F.3d 878,(8th Cir. 2008) (ALJ should

---

[15]At this point in the hearing, the Plaintiff interjected "are you nuts?" AR 279.

generally explain whether third-party statements have been considered, how much if any weight has been assigned to them and why).

### 1.    Pam Skovlund

Ms. Skovlund's written comments are found on a form entitled "Disability Report–Appeal" in the "Remarks" section. AR 123. She wrote:

> Brett was in Special Ed in high school and quit in Nov. of his senior yr. He was burned severely in 1999 on his face, chest,& arms & hands. He cannot work out in the sun due to this. He needs surgery on his knees & the cyst on the end of his tailbone. These things will eventually lead to him being in a wheelchair if not treated. Due to his ADHD he can only handle simple jobs & usually on a part-time basis, therefore he gets no insurance benefits. He cannot hold a decent job due to these disabilities. The medical profession will not help him due to having no money or insurance. They will not help him even get Medicaid in this state as he lives with me, his mother. I am trying to support 2 people on $1,000.00 a month. So what is a person supposed to do here? He is so depressed as he hurts all the time & can't do anything about it. He's an old man walking around in a young body. I don't know what else to say. Please consider helping him.

### 2.    Loni Ching

The letter from the employment consultant (Ms. Ching) is found at AR 129. On February 20, 2007, Ms. Ching wrote the following:

> I would like to take this opportunity to introduce myself. My name is Loni Ching and I work as an Employment Consultant with Career Advantage in Brookings. We are an Employment Agency. We are hired through the Department of Rehabilitation Service of South Dakota to assist people with varying abilities to find and maintain jobs. I joined the team here at Career Advantage in July of 2004.
>
> I have worked with Brett Skovlund for a little over a year. He has been with Career Advantage since 2000. At this time Brett needs to work on a few things before he can stay employed. One of the main things he needs to work on is being med compliant. When working at ADVANCE he would have his mom call in a lot because he was not feeling well. The job tasks for this job were simple. Brett also needs to work on his temper. He seems to get upset with the little things. The day he quit his job at ADVANCE his said a lot of mean things.
>
> At this time I do not feel Brett should be employable due to these obstacles. I will be glad to answer any questions you would have so feel free to contact me.

### 3. Brookings School District

Records from the Brookings School District are also contained in the record. They consist of records of Plaintiff's case manager (Leslie Yeager) and testing performed by the school psychologist (Patrick Mullaney) when Plaintiff was in ninth grade and then again when he was a senior. AR 195-202. The first testing was conducted in 1996 when Plaintiff was fifteen years old. He was given the Wechsler Intelligence Scale for Children. That test showed a verbal IQ of 59, a performance IQ of 68, and a full scale IQ of 60. Interpreted, the test indicated Plaintiff was mildly mentally handicapped. AR 199. His ability with tasks involving sustained attention, short term memory and concentration was poor. *Id.* His skills were assessed at the third grade level. AR 200. A mental health counselor who evaluated Plaintiff (Gary Ambrose) noted withdrawn behavior, anxious/depressed behavior, and attention problems. He also noted social problems. "These scores indicate that Brett has significant emotional/behavioral difficulties." AR 200. Plaintiff's teachers also noted significant behavioral problems and learning problems. AR 201. Also noted were significant problems in interpersonal relations and unhappiness/depression. *Id.*

Plaintiff was evaluated again when he was seventeen years old–a senior in high school. AR 195. Plaintiff continued to have significant problems with anxiety and depression as well as conduct difficulties. AR 196. He did relatively well with basic reading and spelling, but reading comprehension, math, and written expression skills were "quite weak." *Id.*

### 4. David Olson

Plaintiff's former employer, David Olson, wrote a letter dated April 2, 2007. It is reproduced in its entirety below:

> To whom it may concern re: Brett A. Skovlund
>
> Brett worked for me from Nov. 2005 to Feb. 2006. I have a masonry business. Brett was hired as a brick tender. His attention span was so short, it was hard to even train him. One day, he even walked off the work site, without saying a word. He is in his own little world. I see him as unemployable, with all his mental & physical problems.
>
> Sincerely, David Olson

21

# DISCUSSION

## A. Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (citations omitted). Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Klug v. Weinberger*, 514 F.2d 423, 425 (8th Cir. 1975) (citations omitted). "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted). In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. *Woolf*, 3 F.3d at 1213. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. *Id.* If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." *Mittlestedt v. Apfel*, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. *Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. *Smith*, 982 F.2d at 311.

**B.    The Disability Determination and The Five Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1), 1382c(a)(3)(A); 20 C.F.R. § 416.905.  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2), 1382c(3)(B); 20 C.F.R. § 404.905  The ALJ applies a five step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 416.920.  When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary.  *Bartlett v. Heckler*, 777 F.2d 1318, 1319 (8th Cir. 1985).  The five steps are as follows:

**Step One:**    Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 416.920(b).  If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 416.920(c).  If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 416.920a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 416.920(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. *Bartlett v. Heckler*, 777 F.2d 1318, 1320 at n.2 (8th Cir. 1985).  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work.  *Heckler v. Campbell*, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental

impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 416.920a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 416.920(e); 416.945(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 416.920(f).

### C.     Burden of Proof

The Plaintiff bears the burden of proof at Steps One through Four of the Five Step Inquiry. *Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000); 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at Step Five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

### D.     The ALJ's Decision

The ALJ issued a twelve page, single spaced decision on September 22, 2007. AR 13-24. The ALJ's decision discussed all five steps of the above five-step procedure.

At step one, the ALJ found Plaintiff had never engaged in substantial gainful activity, and therefore had not engaged in any substantial gainful activity since the date of his application (September 7, 2005). AR 15.

24

At step two, the ALJ found Plaintiff had "severe" impairments of: borderline intellectual functioning, adult attention deficit hyperactivity disorder, personality disorder, history of polysubstance abuse, and history of second and third degree burns to the upper extremities and face. AR 15.

At step three, the ALJ found none of Plaintiff's severe impairments met or equaled Listings in Appendix 1, Subpart P, Regulation No. 4. AR 16.

At step four, the ALJ concluded Plaintiff had no past relevant work. AR 22. The ALJ proceeded to determine Plaintiff's residual functional capacity. He evaluated Plaintiff's credibility and found all the evidence presented relating to his subjective complaints failed to establish his impairments rendered him as significantly limited as he claimed. AR 17-20. The ALJ found there was "very little objective basis to support claimant's alleged chronic functional limitations due to his mental and physical impairments." AR 18. The ALJ specifically noted the 18 month gap in treatment between September 2005 and June 2006,[16] and Plaintiff's relative success with the treatment on medication (Concerta). AR 19. The ALJ considered the *Polaski* factors (also enumerated in 20 C.F.R. 404.1529(c)). He determined that Plaintiff's "allegations are out of proportion to the medical findings and, therefore, are not fully persuasive." AR 19. The ALJ based his finding in part on Plaintiff's description of his daily activities. AR 20. The ALJ determined that Plaintiff's daily activities were "not indicative of a totally disabled individual but rather of one who could perform at least work at the light, unskilled level. He can take care of his personal needs, watching television, playing video games, preparing simple meals, doing simple household chores, caring for his pet, and fishing." *Id.* The ALJ also noted that Plaintiff's learning disabilities and psychiatric problems were "generally managed" by medications when Plaintiff was compliant. *Id.* The ALJ noted Plaintiff's "prominent and contributing" polysubstance abuse history and that "no recent treatment for either his physical or mental complaints belies claimant's credibility." AR 20. The ALJ also indicated that Plaintiff's failure to complete the evaluation with Drs. Shaffer and Woldt and his non-compliance in

---

[16]The Court notes that the time span between September, 2005 and June, 2006 is nine months, not eighteen months.

taking medication suggests he is not as disabled as he claims. AR 20. The ALJ noted the record contains no opinions from acceptable treating or examining physicians indicating Plaintiff is disabled or that he has limitations greater than those determined by the ALJ. AR 20. The ALJ acknowledged, but discounted the evaluation by Drs. Woldt and Shaffer because "these examiners only saw the claimant once[17]" and the evaluation was never completed. AR 21. The ALJ "carefully considered" their evaluation but gave it diminished weight because it indicates "extreme limitations that are unsupported by the objective evidence, especially in light of the fact that his symptoms are controlled when complying with his mental health treatment." AR 21. "As well, these opinions are not supported by the claimant's own descriptions of his activities of daily living." *Id.*

At step five, the ALJ found that given Plaintiff's residual functional capacity which was compromised by nonexertional limitations, he is capable of performing a limited range of unskilled light/sedentary work. AR 23. The ALJ relied on the VE's testimony to find that unskilled jobs including bakery worker (light unskilled) and assembler (sedentary unskilled) would be suitable for Plaintiff and widely available within the South Dakota job market. The ALJ found that Plaintiff, therefore, was not "disabled." AR 23.

### E. Plaintiff's Argument

Plaintiff asserts the Commissioner's decision that he is not disabled is not supported by substantial evidence and is contrary to law. In support of his assertion, he advances three arguments: (1) the Commissioner erred at Step Three wherein he concluded the clinical signs and findings attending Plaintiff's disabilities do not meet an impairment or combination of impairments listed in Appendix 1, Subpart P, Regulations No. 4; (2) the Commissioner's determination at Step Four regarding the Plaintiff's residual functional capacity is not supported by substantial information on the record; and (3) the Commissioner erred at Step Five in concluding that Plaintiff can perform unskilled, light duty work, and there are a significant number of jobs in the national economy he can perform.

---

[17]Their report indicates the evaluation, although it was not completed, was performed in the course of two office visits. AR 130.

## F.    The Commissioner's Argument

The Commissioner asserts the record evidence supports the ALJ's finding that despite Plaintiff's impairments, he retains the residual functional capacity to perform a unskilled light work and can perform other work existing in significant numbers in the national economy. The Commissioner argues even though the record may contain some evidence that could support a different outcome, substantial evidence supports the ALJ's ultimate conclusion that Plaintiff is not disabled.

## G.    Analysis

The Plaintiff's assignments of error will be reviewed in turn:

### 1.    The Step Three Finding (The Listings)

Plaintiff asserts the ALJ erred by failing to find him disabled at Step Three of the process (the "Listing"). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. *Bartlett v. Heckler*, 777 F.2d 1318, 1320 at n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. *Heckler v. Campbell*, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a Listed impairment the ALJ must proceed to step four. Listings which were considered by the ALJ were 1.08 (Muskuloskeletal System); 12.02 (Organic Mental Disorders); 12.08 (Personality Disorders) and 12.09(Substance Addiction).

Plaintiff asserts that the combination of his borderline intellectual functioning and his many mental health issues meet or equal Listings 12.02 (Organic Mental Disorders) , 12.04 (Afffective Disorders) or 12.06 (Anxiety Related Disorders). In order to meet the listing level of severity, the requirements of the "A" and "B" criteria must be met, or the "C" criteria must be met. (For Listing 12.06, the Listing is met if A and B or A and C are met). In order to meet the "B" criteria for any of the 12.00 mental disorders, Plaintiff must demonstrate "marked" restriction of at least two of the following: activities of daily living, maintaining social functioning, maintaining concentration,

persistence or pace, <u>or</u> repeated episodes of decompensation.[18] Generally speaking, the "C" criteria consist of repeated or chronic episodes of decompensation involving the particular mental disorder which have, among other things, caused at least a one year history of the inability to function outside a highly supportive living arrangement. (For listing 12.06, the "C" criteria requires a complete inability to function independently outside the area of one's home).

In order to qualify for disability benefits under Step Three of the analysis, the claimant must present medical findings equal in severity to *all* the criteria for the listed impairment. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). While Plaintiff's medical and school records amply demonstrate his long history of difficulty in intellectual functioning and personality disorders, they do not demonstrate symptoms which meet the severity required to meet the "B" or "C" criteria of any of the listings which are cited by the ALJ or by Plaintiff. *See, e.g.* Dr. Heglund's notes which assign a GAF score of 55, indicating "moderate" as opposed to "marked" difficulty in social functioning and symptoms. Indeed, while Plaintiff asserts the ALJ erred by failing to find him disabled under the Listings, he does not specifically state which category of the Listings he believes he meets or equals, nor does he specifically recite the requirements of any particular Listing, followed by citation to record evidence which would entitle him to a finding of "disabled" under that Listing. The ALJ's finding that none of Plaintiff's impairments meet or equal a Listed impairments is supported by substantial evidence.

### 2. The Step Four Finding (Residual Functional Capacity)

#### a. The Commissioner Failed to Give Appropriate Deference to the Opinions of the Treating/Examining Physicians

The ALJ did not assign proper weight to the opinions of the treating/examining physicians (Drs. Alvine and Moeller from East Central Mental Health Center in Brookings, Dr. Turner from

---

[18] A "marked" limitation is defined generally as more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis. *See* Subpt. P. App. 1. Pt. 404 § 12.00 (C).

28

Avera Brookings Medical Clinic, and Drs. Woldt and Shaffer from Brookings Psychological Group). Instead, the ALJ adopted the opinion of a non-examining/non-treating physicians (Dr. Gunn, Dr. Buchkoski) who reviewed Plaintiff's medical records, and Dr. McGrath, who merely reviewed Plaintiff's records and observed a very brief administrative hearing.

> A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. By contrast, the opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence. Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits.

*Sing v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (internal citations omitted). Also, 20 C.F.R. § 414.927(d) provides the factors to consider for assigning weight to medical opinions. That regulation provides:

> (d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) Length of treatment relationship and frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we give the source's opinion more weight that we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. *****. When the treating source has reasonable knowledge of your impairment(s) we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Support ability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all the pertinent evidence in our claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

The Commissioner may grant less weight to a treating physician's opinion only when the opinion conflicts with other substantial medical evidence in the record. *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000).

Plaintiff treated at the East Central Mental Health Center from 2002 through 2007. Although

there are significant gaps in treatment, Plaintiff's history there does present a consistent picture which the ALJ did not adequately address. Drs. Alvine, Moeller and Turner all have long-term examining and treating relationships with Plaintiff. Although Drs. Woldt and Shaffer only examined Plaintiff for the purpose of evaluating him for rehabilitation planning, the evaluation consisted of an intensive two day testing/interview session. Well-recognized diagnostic procedures were used, and the results were, contrary to the ALJ's conclusion, supported by years worth of other substantial medical evidence in the record.

Plaintiff was well known to Dr. Alvine, Dr. Heglund, Dr. Turner, and Dr. Moeller through his many visits to their clinics throughout the years for his substance abuse and mental health issues. Dr. Heglund, while not asked specifically to address the issue of disability, assigned a GAF score which indicates Plaintiff's ability to function in the workplace was diminished and highly variable. Drs. Woldt and Shaffer indicated in their report that they had reviewed Plaintiff's records when they opined that Plaintiff was incapable of independent living or employment. AR 144.

The ultimate determination regarding disability is for the ALJ to make. *See Cox v. Barnhart*, 345 F.3d 606, 608 (8th Cir. 2003) ("[i]t is the ALJ's job to reach a decision as to the Claimant's legal disability by evaluating the objective medical evidence before him."); 20 C.F.R. § 416.927(e)(1) (statement by a medical source that a claimant is disabled is not dispositive). If the statements and GAF assignments by Plaintiff's treating physicians and therapists were viewed in isolation, the ALJ would have been correct in giving them little weight as conclusory. These observations, however, were only part of far more extensive records and diagnostic exams supplied. Viewed in the context of his medical record, the observations of Drs. Woldt and Shaffer, Dr. Heglund, and Plaintiff's other therapists are the culmination of the numerous visits and extensive treatment Plaintiff received from his physicians over a period of many years and are wholly consistent with their treatment notes.

While the assignment of GAF scores is not dispositive, it is helpful in the absence of a more definitive functional assessment by a treating physician. *See, e.g. Sloan v. Astrue*, 499 F.3d 883, 885 (8th Cir. 2007) (psychologist assigned GAF of 50, case remanded for further consideration in light of

claimant's serious impairments); *Bruggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003) (claimant's GAF of 50 "reflects serious limitations in the patient's general ability to perform basic tasks of daily life. . ."); *Wilson v. Astrue*, 493 F.3d 965, 967-68 (8th Cir. 2007) ( significant evidence from claimant's treating physicians that she "suffers greatly from her from mental illness -that she has chronic feelings of being overwhelmed with daily living . . . the GAF and full scale IQ scores are certainly pieces of the hypothetical puzzle necessary to gain an accurate overall assessment of [her] functioning."). In Plaintiff's case, a GAF score of 55 is indicative of someone who has few friends, conflicts with co-workers, and misses work frequently. *See* fn. 2, supra.

Instead of referring to the treatment notes and observations of Drs. Woldt and Shaffer, Dr. Heglund, Dr. Alvine, Dr. Moeller, and/or Dr. Turner the ALJ relied on the opinions of Dr. Gunn and Dr. Buchkoski, both one-time consultative DDS physicians who never examined Plaintiff and Dr. McGrath, who never examined or interviewed Plaintiff but reviewed the record and observed the brief administrative hearing. "We have stated many times that the results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision." *Cox*, 345 F.3d at 610 (citations omitted). "This is especially true when the consultative physician is the only examining doctor to contradict the treating physician." *Id.*

The ALJ discounted the opinions of Drs. Woldt and Shaffer because they were "unsupported by the objective evidence, especially in light of the fact that his symptoms are controlled when complying with his mental health treatment" and because they were "not supported by claimant's own descriptions of his activities of daily living." This conclusion, , however, ignores not only the Plaintiff's medical history and school records, but also the evidence from Plaintiff's job coach and his mother which indicate Plaintiff's efforts to hold a job were unsuccessful during the entire course of his time with Career Advantage (since the year 2000--seven years) *including* the times he was med-compliant. Likewise, the Eighth Circuit has repeatedly emphasized that the ability to do basic household chores does not preclude a finding of disability. *Draper v. Barnhart*, 425 F.3d 1127, 1131 (8th Cir. 2005). In *Draper*, the Court cautioned that light housekeeping chores should not be compared to "the ability to perform the requisite physical acts day in and day out, in the competitive

and stressful conditions in which real people work in the real world." *Id.* Claimant's testimony regarding his daily activities consisted of eating microwaved pizza at 9:00 a.m., sleeping, and watching television. He does not bathe on a daily basis, does not do housework, yard work, does not use a computer, does not drive, cannot keep a checkbook, barely socializes with friends, and from the sounds of it some days does not even come out of his room to speak to his own mother with whom he lives. This does NOT compare to "the ability to perform the requisite physical acts day in and day out, in the competitive and stressful conditions in which real people work in the real world." *Draper v. Barnhart*, 425 F.3d 1127, 1131 (8th Cir. 2005).

The Commissioner asserts the ALJ properly relied upon the non-treating physicians because Drs. Woldt and Shaffer only examined Plaintiff once and did not have an ongoing treating relationship with him under the regulations. As explained above, the Court reads the records differently, as it appears Plaintiff saw Drs. Woldt and Shaffer twice for purposes of their neuropsychological evaluation, but Plaintiff failed to return for the remaining sessions. Nevertheless, pursuant to , 20 C.F.R. § 414.927(d) the weight to be given a physician's opinion should include several factors, including whether the physician actually examined the claimant, and how well the physician's opinion is supported by other record evidence. Drs. Woldt and Shaffer did examine the claimant (Drs. Buchkoski, Gunn and McGrath did not). Further, Woldt and Shaffer's opinions are supported by ample record evidence dating back to Plaintiff's ninth grade school records, where the school psychologist noted Plaintiff's intellectual functioning exceeded only 0.8 of the population. It was noted already in ninth grade that Plaintiff had "significant emotional/behavioral difficulties." Plaintiff's medical and vocational records throughout the years, continuing until the date of the hearing, continued the pattern, with repeated references to low intellectual functioning, attention deficit disorder, anti-social traits, problems with judgment and organizational skills, and an inability to hold a job, even when he was medication-compliant.[19]

---

[19]For example it appears Ms. Ching worked with Plaintiff throughout the year 2006 and into early 2007. During that same time (June 2006 through March 2007), according to Dr. Moeller's records, Plaintiff was medication compliant. According to Ms. Ching's letter, however, Plaintiff was nevertheless unable to hold a job.

Viewed as a whole, the record supports the conclusion that Plaintiff is limited in his ability to interact with the public and co-workers. A treating source's opinion is to be given controlling weight if it is supported by medically accepted laboratory diagnostic techniques and is consistent with other substantial evidence. Even if Woldt and Shaffer are not considered treating sources, their opinions are consistent with the records and are entitled to more weight than a non-examining, non-treating physician. The ALJ's decision in this case to reject well-supported, consistent evidence and opinions from examining physicians and instead rely upon the opinions of non-treating, non-examining physicians is not supported by substantial evidence.

### b. The Credibility Determination

The Plaintiff's second assignment of error is that the ALJ failed to properly determine his credibility regarding subjective complaints. This analysis must begin with the principle that the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Critical to the ALJ's determination was his finding that Plaintiff's complaints were not credible. At the fifth step, the ALJ disregarded the opinion of the vocational expert which included the limitations described by Plaintiff. Rather, the ALJ accepted opinion of the vocational expert which included the limitations described by a non-treating, non-examining consultant (Dr. McGrath).

Ordinarily, credibility determinations are peculiarly for the finder of fact. *Kepler v. Chater*, 68 F.3d 387, 391 (8th Cir. 1995). Findings as to credibility, however, should be closely and affirmatively linked to substantial evidence and "not just a conclusion in the guise of findings." *Id.* The ALJ must articulate specific reasons for questioning the claimant's credibility where subjective pain is a critical issue. *Id.* Thus, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the Plaintiff's complaints. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004).

When evaluating evidence of pain, the ALJ must consider: (1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the dosage, effectiveness and side effects of any medication; and (5) the claimant's functional restrictions. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004) *citing Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). *See also* 20 C.F.R. § 416.929. The ALJ may not reject a claimant's subjective pain complaints solely because the objective medical evidence does not fully support them. *Polaski* at 1320. The absence of objective evidence is merely one factor to consider. *Id.*

When a Plaintiff claims the ALJ failed to properly consider his subjective pain complaints, the duty of the Court is to ascertain whether the ALJ considered *all* of the evidence relevant to the Plaintiff's complaints of pain under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. *Masterson*, 363 F.3d at 738-39 (emphasis added). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all the evidence. *Id.*

The ALJ did not cite *Polaski* but he did cite the C.F.R. section which codifies the *Polaski* factors. (20 C.F.R. § 416.929(c)(3)). The ALJ rejected Plaintiff's complaints because "when the claimant's subjective complaints are considered in conjunction with the objective medical evidence and the record as a whole, they are not fully credible." AR 20. The task for the Court, therefore, is to determine whether the ALJ properly considered all the record evidence when he determined Plaintiff's subjective complaints were "not totally credible."

First, the ALJ discussed the significance of Plaintiff's daily activities. He noted Plaintiff takes care of his personal needs, watches TV, plays video games, prepares simple meals, does simple household chores, cares for his pet, and goes fishing. In reality, Plaintiff testified that he did not shower on a daily basis, ate micro-waved meals, did not fish anymore because he lost his license, lets his dog out but otherwise his mom takes care of it, doesn't do house or yard work, and plays video games once or twice a month. The day before the hearing, plaintiff stayed in his room all day; he saw his mother 10:00 p.m. when he came out of his room but he did not speak to her. AR 241.

The Eighth Circuit has noted many times that "An SSI Claimant need not prove that she is bedridden or completely helpless to be found disabled and the fact that claimant cooks and cleans for herself, shops for groceries, does laundry, visits friends, attends church, and goes fishing does not in and of itself constitute substantial evidence that a claimant possesses the residual functional capacity to engage in substantial gainful activity." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989).

The ALJ cited Plaintiff's use/non-use of prescription medication and his lack of recent treatment for mental and physical health issues. The ALJ stated "the fact that there is a huge time gap between medical treatments, up to 18 months, and no recent treatment for either his physical or mental complaints also belies claimant's credibility." AR 20. This conclusion ignores Plaintiff's mother's hearing testimony and other record evidence regarding Plaintiff's financial inability to afford prescription drugs and medical care. AR 123, 139, 140, 145, 205, 254, 255, 256, 264 . A claimant may not be penalized for failing to seek treatment he cannot afford. "It flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him." *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986). *See also* SSR 82-59 (justifiable cause for failure to follow prescribed medical treatment includes inability to pay); *Tome v. Schweiker*, 724 F.2d 711, 714 (8th Cir. 1984) ("[W]e believe that a lack of sufficient financial resources to follow prescribed treatment to remedy a disabling impairment may be, and in this case is, an independent basis for finding justifiable cause for noncompliance.")

Finally, "[i]t is well settled that an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them." *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir. 2003). The ALJ must also consider, among other things, observations by third parties. *Id.* There is no mention in the ALJ's decision of the third-party report from Plaintiff's mother, employer, or employment consultant, all of which are entirely consistent with the symptoms reported by Plaintiff's physicians and by Plaintiff himself. For all of these reasons, the ALJ's credibility finding regarding Plaintiff's self-reported complaints and resulting limitations is not supported by substantial evidence.

36

### 3, The Step Five Finding (Plaintiff's Ability to Perform Substantial, Gainful Activity)

The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) *abrogation on other grounds recognized in Higgins v. Apfel*, 222 F.3d 504 (8th Cir. 2000). However, "[t]his does not mean that the hypothetical must include all of the impairments a claimant alleges. It is required to include only those impairments that the ALJ finds actually exist, and not impairments the ALJ rejects–assuming of course, that the ALJ's findings are supported by substantial evidence." *Onstad v. Shalala*, 999 F.2d 1232, 1234-35 (8th Cir. 1993). The ALJ's hypothetical question to the vocational expert must include all the appropriate impairments, and testimony by a vocational expert constitutes substantial evidence only when based on a proper hypothetical question. *Tucker v. Barnhart*, 363 F.3d 781, 784 (8th Cir. 2004). Jobs which are identified by the vocational expert, therefore, which include unrealistic physical demands included in a flawed hypothetical by the ALJ cannot, therefore, constitute substantial, gainful employment.

As explained above, the opinions of non-treating, non-examining physicians are ordinarily –and are in this case--insufficient to constitute substantial evidence upon which to formulate an accurate residual functional capacity. *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). "Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits." *Id.* In this case, as in *Nevland*, the ALJ should have relied upon the opinions from the treating/examining physicians to assess Plaintiff's residual functional capacity. Because the hypothetical upon which the vocational expert relied was based upon the opinions of two non-treating, non-examining State Agency Physicians and a consulting physician who never examined Plaintiff, the hypothetical, and thus the vocational expert's opinion is likewise not supported by substantial evidence.

### CONCLUSION

Plaintiff has a long, well-documented history of borderline intellectual functioning and psychological conditions which are poorly controlled in part because he cannot afford proper care.

Plaintiff sought relief in the form of care from free medication, but his medication regime has been sporadic, at best. The ALJ erred by relying on a consulting non-treating, non examining physicians instead of Plaintiff's treating/examining physicians whose treatment notes and records consistently indicate Plaintiff is incapable of substantial gainful employment, and whose opinions were consistent and well documented by objective record evidence. The ALJ's determination that Plaintiff retains the residual functional capacity to perform a significant range of unskilled work is not supported by substantial evidence.

If the record presented to the ALJ contains substantial evidence supporting a finding of disability, a reviewing court may reverse and remand for an order granting benefits. *Andler v. Chater*, 100 F.3d 1389, 1394 (8th Cir. 1996). This is one of those cases. Under the circumstances, further hearings would merely delay Plaintiff's receipt of benefits. For these reasons, it is respectfully recommended to the District Court that the Commissioner's decision denying Brett Skovlund's claim for disability benefits under Title XVI of the Social Security Act should be **REVERSED** and remanded with directions to order the Commissioner to award benefits to Mr. Scovlund in the amount required under applicable statutes and regulations.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).
*Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).


Dated this 8th day of September, 2009.

BY THE COURT:

John E. Simko
United States Magistrate Judge